UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

JEFFERY ATKINS,              )    Civil Action No.: 4:10-cv-1296-JMC-TER
                                     )
                 Plaintiff,    )
                                       )
        -vs-                       )
                                       )    **REPORT AND RECOMMENDATION**
                                       )
ERIC HOLDER, ATTORNEY GENERAL, )
FEDERAL BUREAU OF PRISONS,     )
                                         )
                 Defendant.    )
_____ )

## I.    INTRODUCTION

        This action arises out of Plaintiff's employment with the Federal Bureau of Prisons.  Plaintiff

alleges causes of action for racial discrimination, hostile working environment[1] and retaliation in

violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e), age

discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621

et seq., and disability discrimination and failure to accommodate in violation of the Americans with

Disabilities Act (ADA), 42 U.S.C. § 12101, et seq.  Plaintiff also asserts a state law cause of action

for breach of contract.  Presently before the Court is Defendant's Motion for Summary Judgment

(Document # 65).[2]  All pretrial proceedings in this case were referred to the undersigned pursuant

to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because

the Motion for Summary Judgment is a dispositive motion, this Report and Recommendation is

entered for review by the district judge.

_____

           [1]Plaintiff consents to dismissal of this cause of action.  See Response p. 1 n.1.

           [2]Defendant moves for summary judgment on all of Plaintiff's claims except his claim for
breach of contract.

## II.    FACTS

### A.    Persons Involved in this Action

At all times relevant to this action, Plaintiff, an African-American male over the age of 40, was employed with the Federal Bureau of Prisons (BOP) at the Federal Corrections Institution in Williamsburg, South Carolina (FCI Williamsburg). Plaintiff began his employment with FCI Williamsburg as a Corrections Officer and later became a Correctional Counselor in Unit 3 of FCI Williamsburg. Plaintiff Dep. p. 9.

John Owen (Warden Owen) was the Warden at FCI Williamsburg beginning in 2007 and was responsible for the final decision to terminate Plaintiff. Owen Dep. pp. 6, 12.

Nicole Cunningham was the Human Resource Manager at FCI Williamsburg beginning in 2005 and at all times relevant to this action. Cunningham Dep. p. 8.

Gary Miller was the Unit Manager over Unit 3 at FCI Williamsburg and Plaintiff's direct supervisor. Miller Dep. p. 9.

Steve Langford has been the Associate Warden of Operations over Human Resources and Cunningham's supervisor at FCI Williamsburg since 2006. Langford Dep. p. 6.

Bobby Meeks was the Associate Warden of Programs at FCI Williamsburg from June 2007 to May 2010 and oversaw the Unit Managers at the prison including Plaintiff's supervisor Miller. Meeks Dep. pp. 6-8.

Michael J. Shoemaker , at all times relevant to this case, was an electronic technician at FCI Williamsburg and served in various positions for the American Federal Government Employees union's (AFGE) local office, and was involved in internal efforts to resolve the issues between Plaintiff and management at FCI Williamsburg. Shoemaker Dep. pp. 14-20.

William Turner has been a plumber at FCI Williamsburg since 2003, was the AFGE President and Secretary for the union's local chapter at various times relevant to the complaint, and was involved in internal efforts to resolve the issues between Plaintiff and management at FCI Williamsburg. Turner Dep. pp. 9-13.

Michael Bink , a Safety Manager and the former disabled veterans program manager at FCI Williamsburg, and Dr. Suzanne M. House, the Chief Psychologist at FCI Williamsburg were also involved in the events giving rise to this action.  Plaintiff Dep. pp. 28-32.

### B.    Plaintiff's Position at FCI Williamsburg

Plaintiff was a Correctional Counselor in Unit 3 of FCI Williamsburg.  Plaintiff Dep. p. 9. Miller, Plaintiff's direct supervisor, testified that, as a correctional counselor, Plaintiff would "be in charge of sanitation within the housing unit, doing visiting.  He would also do phone lists.  He would do counseling groups, if needed.  He would talk with the inmates.  Just general, everyday dealings with the inmates."  Miller Dep. pp. 9-10.  Miller testified that he did not recall ever having to discipline Plaintiff or otherwise having performance issues with him.  Miller Dep. p. 10.  Miller stated that Plaintiff "was a good employee.  He performed well."  Miller Dep. p. 14.

Plaintiff testified that he was "basically a liaison between the inmates and management for everything, clothing, telephone calls, emergencies, complaints."  Plaintiff Dep. p. 44.  Plaintiff also testified that he had security duties and would have to use physical force to lock inmates up if they got out of hand.  Plaintiff Dep. p. 45.  He also had to escort inmates in and out of the DHO hearing room.  Plaintiff Dep. pp. 46-47.

The Position Description for a Correctional Counselor indicates that "[t]he Correctional Counselor develops and implements programs within the unit to meet the individual needs of the

inmates confined, to include individual as well as group counseling. . . . The Correctional Counselor plays a key role in maintaining and enhancing the security of the unit and institution by his/her extensive contacts with the inmates." Position Description (attached as Ex. 4 to Defendant's Motion) p. 1. The Position Description further provides, <u>inter</u> <u>alia</u>,

> Along with all other correction institution employees, incumbent is charged with responsibility for maintaining security of the institution. The staff correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis.
>
> Specific correctional responsibilities include custody and supervision of inmates, responding to emergencies and institution disturbances, participating in fog and escape patrols, and assuming correctional officer posts when necessary. The incumbent is required to shakedown inmates, conduct visual searches of inmate work and living areas for contraband, and is responsible for immediately responding to any institution emergencies. The incumbent must be prepared and trained to use physical control in situations where necessary, such as in fights among inmates, assaults on staff, and riots or escape attempts.
> * * *
>
> **Factor 8–Physical Demands**
> The work is mostly sedentary although there is some walking and moving throughout the unit and institution to visit inmate work sites, respond to emergencies, and converse with treatment staff concerning inmates assigned to the incumbent's work load.
>
> **Factor 9–Work Environment**
> All staff in the correction facility, regardless of their occupations, are expected to perform law enforcement functions. As a result, the incumbent is regularly subject to physical hazards and dangerous conditions such as assaults and hostage situations. Due to the potential for uncontrollable situations to occur in a correctional institution, the level of risk for hazardous and stressful working conditions is very high.
> The duties of this position require frequent direct contact with individuals in detention suspected or convicted of offenses against the criminal laws of the United States. Daily stress and exposure to potentially dangerous situations such a physical attack are an inherent part of this position; consequently, it has been designated as a law enforcement position.

Position Description pp. 2-3, 6 (attached as Ex. 4 to Defendant's Motion).

The Bureau's policies require that employees in law enforcement positions must be able to perform numerous physical activities, including walking up to one hour, standing for up to one hour, ability to perform self-defense movements, running an extended distance, dragging a body an extended distance, carrying a stretcher with one other person, climbing stairs, and lifting objects weighing 25lbs. Physical Requirements for Institution Positions (attached as Ex. 68 to Defendant's Motion).

### C. Plaintiff's Medical Diagnoses and Work Restrictions

Plaintiff testified that he has been diagnosed as having degenerative joint disease of the right knee, chrondomalacia, an aggravated herniated disc, sciatica of the left hip, hypothyroidism, and sleep apnea. Plaintiff Dep. p. 10. In May and June of 2006, Dr. Justin Baker with McLeod Family Medicine indicated Plaintiff had sleep apnea which causes severe drowsiness. Dr. Baker indicated Plaintiff had a very difficult time performing his job duties because of this and that it would be best if Plaintiff have a medical leave of absence for these two months. Letters Dated May 8, 2006 and June 16, 2006 (attached as Exs. 8 and 9 to Defendant's Motion).

On July 24, 2006, Dr. Baker indicated Plaintiff had developed Plantar fascitis and would have difficulty performing his duties and will need rest to help with his recovery. He indicated Plaintiff would need a month for his recovery. Letter Dated July 24, 2006 (attached as Ex. 10 to Defendant's Motion). On August 28, 2006, a nurse with McLeod Family Medicine indicated Plaintiff would need another month off before returning to work. Form Dated August 28, 2006 (attached as Ex. 11 to Defendant's Motion).[3]

---

[3]It is not evident from the record whether Plaintiff was actually absent from work from May through the end of September 2006 as recommended by his doctors.

On June 13, 2007, Dr. Baker indicated due to Plaintiff's polyarthropathy, he has difficulty standing for long periods of time. He further indicated Plaintiff could only stand 15 consecutive minutes at a time. Lastly, Dr. Baker indicated Plaintiff's training regiment should be adjusted to coincide with this need. Letter Dated June 13, 2007 (attached as Ex. 12 to Defendant's Motion). Dr. Baker further indicated Plaintiff had sleep apnea and requested that his records be reevaluated to determine if whether it was related to his military service. Second Letter Dated June 13, 2007 (attached as Ex. 13 to Defendant's Motion). Plaintiff testified Miller was aware of this restriction. Plaintiff Dep. p. 43.

On June 27, 2007, Dr. Baker reiterated the limitation that Plaintiff could only stand 15 consecutive minutes at a time, and noted that the difficulty should last at least 6 months. Dr. Baker indicated Plaintiff's workload should be adjusted to coincide with this need. Letter Dated June 27, 2007 (attached as Ex. 14 to Defendant's Motion).

On January 10, 2008, Dr. Baker indicated Plaintiff had difficulty with squatting due to Achilles tendonitis and could not stand for extended periods of time. The doctor indicated that Plaintiff should be excused from squatting and standing for periods of 15 minutes or greater and indicated a follow-up reassessment would be conducted in 6 months. Letter dated January 10, 2008 (attached as Ex. 18 to Defendant's Motion).[4]

Plaintiff testified that he injured his knee while at work on February 22, 2008. Plaintiff Dep. p. 29. On February 23, 2008, a doctor at Dorn VA Medical Center indicated Plaintiff had the following work limitations: "May walk to work from parking lot. May not stand for more than 5

_____

[4]The record does not disclose any specific notice to Miller or anyone else at the Bureau of the January 2008 restrictions recommended by Plaintiff's doctors for Achilles tendonitis.

minutes. May sit for 8 hours. May not climb, push, lift or pull." The doctor also indicated Plaintiff would be reevaluated in eight weeks. Work Limitations Dated February 23, 2008 (attached as Ex. 19 to Defendant's Motion).

On March 6, 2008, Miller received the February 23, 2008, Work Restrictions, after being out of the office from February 25 through March 3, 2008. Memo Dated April 30, 2008 (attached as Ex. 26 to Defendant's Motion). On March 21, 2008, David Massa, M.D., a medical officer with FCI Williamsburg, emailed Cunningham and informed her that "due to the severity of the medical restriction 'may not stand for more than five minutes' prescribed by this employee's physician, it is my opinion that he cannot perform the duties required in a correctional environment at this time. Of course, should his physician feel his condition has improved to the point where the restriction can be lifted or modified this opinion is open to reevaluation." Email Dated March 21, 2008 (attached as Ex. 24 to Defendant's Motion). Plaintiff began using annual and sick leave on March 21, 2008. Memo Dated April 30, 2008 (attached as Ex. 26 to Defendant's Motion). On April 3, 2008, Miller advised Plaintiff that he had limited annual and sick leave and, if he exhausted that leave, he would need to request leave without pay via a memorandum to the Warden. Memo Dated April 3, 2008 (attached as Ex. 20 to Defendant's Motion).

On April 15, 2008, a counselor with Florence CBOC wrote a letter indicating that Plaintiff had a provisional diagnosis of PTSD. The counselor further indicated that Plaintiff had an appointment with a psychiatrist in June 2008, and the diagnosis would be further confirmed and treated at that time. Letter Dated April 15, 2008 (attached as Ex. 22 to Defendant's Motion).

On April 29, 2008, a doctor at the Florence VA Outpatient Clinic reiterated the same work limitations ("May walk to work from parking lot. Mr. Atkins may not stand for more than 5 minutes.

He may sit for 8 hours. May not climb, push, lift or pull.") and indicated that Plaintiff would be reevaluated on May 5, 2008, with his primary care provider. Letter Dated April 29, 2008 (attached as Ex. 23 to Defendant's Motion). On April 30, 2008, G. Loranth, the Medical Director for FCI Williamsburg, sent a memorandum to Cunningham, offering his opinion that Plaintiff could not perform the duties required in a correctional environment with a medical restriction limiting him to standing no more than five minutes. He further stated that, should Plaintiff's restrictions be lifted or modified, his opinion would be to re-evaluate at that time. Memo Dated April 30, 2008 (attached as Ex. 21 to Defendant's Motion).

Plaintiff exhausted his annual and sick leave on April 22, 2008. Memo Dated April 30, 2008 (attached as Ex. 26 to Defendant's Motion). On April 30, 2008, Plaintiff requested leave without pay from April 25, 2008, through May 5, 2008. Warden Owen approved the request on May 1, 2008. Note Dated April 30, 2008 (attached as Ex. 25 to Defendant's Motion).

On May 5, 2008, a doctor with the Florence VA Primary Care Clinic revised Plaintiff's work limitations, indicating that Plaintiff should not stand at work for more than 15 minutes and indicated that his letter was an addendum to the April 29, 2008, letter set forth above. Letter Dated May 5, 2008 (attached as Ex. 27 to Defendant's Motion).

On May 8, 2008, a provider at the Dorn VA Medical Center indicated Plaintiff should have light duties for one month.[5] He further indicated Plaintiff had the following physical limitations: "No prolonged standing/walking" and "No kneeling, squatting, crawling, multiple stairs." Report of Medical Examination (attached as Ex. 28 to Defendant's Motion). On May 9, 2008, Miller and

_____

[5]It is unclear whether these restrictions were related to Plaintiff's knee injury or some other medical condition.

Cunningham met with Plaintiff regarding his medical restrictions. They advised Plaintiff not to complete any activity or task which would require him to climb, push, lift, pull or stand more than fifteen minutes. They further advised him that, although he would still need to respond to institution emergencies, he should take the time he needed in order to remain within the restrictions placed on him by his physician. Memo Dated May 9, 2008 (attached as Ex. 29 to Defendant's Motion).

On June 2, 2008, Dr. Koon with the VA Hospital noted that Plaintiff was seen for lumbosacral disc disease and indicated Plaintiff could "return" to light duties. Note Dated June 2, 2008 (attached as Ex. 30 to Defendant's Motion).

On July 17, 2008, Dr. Eady at the Dorn VA Medical Center indicated Plaintiff could return to light duties on July 17, 2008. He further indicated Plaintiff had the following physical limitations: no climbing, no prolonged standing/walking, no lifting/carrying greater than 40 lbs; and no kneeling, squatting, crawling. In the "Comments" section of the Report, the doctor indicated that "this restriction is permanent." Report of Medical Examination (attached as Ex. 35 to Defendant's Motion).

On July 31, 2008, Cunningham wrote a letter to Plaintiff addressing the most recent medical restrictions placed on Plaintiff in the July 17, 2008, Report. Cunningham noted that the Report placed him on permanent restrictions but did not identify the medical conditions that required such restrictions. Cunningham indicated that the documents submitted by Plaintiff were not "medically acceptable evidence" of his inability to work. The letter directed Plaintiff to obtain additional, specific information from his physician regarding his medical condition. Cunningham further noted that Plaintiff had been on light duty since May 8, 2008, and it was causing a hardship in Unit Management. Letter Dated July 31, 2008 (attached as Ex. 39 to Defendant's Motion). Plaintiff's

physician, Dr. Eady, provided a handwritten response to the information sought in Cunningham's letter.[6] Dr. Eady indicated a diagnosis of degenerative joint disease of the right knee and degenerative disc disease of the lumbar spine. In the response to Cunningham's request for "an estimate of the expected date of a full or partial recovery," Dr. Eady stated, "The knee condition will get worse over time. At present, it is mild." Letter with Handwritten Responses (attached as Ex. 40 to Defendant's Motion).

On August 6, 2008, Jason Anderson, Psy.D, of the Behavioral Health Group sent correspondence to Gary Miller. Dr. Anderson indicated Plaintiff was experiencing significant levels of anxiety, depression and paranoia. Dr. Anderson also indicated Plaintiff was exhibiting a number of secondary symptoms including difficulty sleeping, hypervigilance, irritability, and angry outbursts. Finally, Dr. Anderson diagnosed Plaintiff with PTSD. Letter Dated August 6, 2008 (attached as Ex. 6, 2008).

### D.    Plaintiff's Request for Reasonable Accommodation

On August 6, 2008, Plaintiff submitted a DOJ Form 100A, Request for Reasonable Accommodation[7]:

> I am requesting a work reassignment to an area and environment where the serious potential for violent act(s) and behavior against me by inmates is minimal. This request is due to my current and (obvious) disabilities and my unforeseen disabilities such as post traumatic stress disorder, sleep apnea, herniated disk, heel spurs somnolence and sciatica. These illnesses and injuries have been documented and a copy of each has been provided to my immediate supervisor.

---

[6]There is no date on the handwritten response and it is not clear when the response was provided to Cunningham.

[7]Plaintiff also asserts that Miller disregarded the temporary restrictions placed on him in 2007 relating to his previous medical conditions. Plaintiff Dep. p. 43-44.

DOJ Form 100A (attached as Ex. 42 to Defendant's Motion). That same day, Miller and Cunningham met with Plaintiff regarding his Request for Reasonable Accommodation. They advised Plaintiff that he needed to submit medical documentation for the Bureau to review his request. They further advised Plaintiff that, at that time, they would not be able to approve any additional accommodations other than his current restricted duty status, and, if he could not continue in that status, he would have to take leave or request leave without pay until the medical documentation was received and a decision was made on his request. Memos Dated August 6, 2008 (attached as Exs. 43, 44 to Defendant's Motion).

The next day, August 7, 2008, Plaintiff attempted to return to work and was told by Miller that he could not enter the institution until a decision had been made regarding his Request for Reasonable Accommodation. Memo dated August 7, 2008 (attached as Ex. 45 to Defendant's Motion). Additionally, on August 7, 2008, Chief Psychologist for FCI Williamsburg, Suzanne House, prepared a memorandum to Cunningham regarding her review of the letter from Dr. Anderson addressing Plaintiff's PTSD. Dr. House indicated that the letter created concerns for her regarding Plaintiff's ability to function in a correctional environment. Dr. House suggested that further evaluation was necessary to determine whether Plaintiff had the ability to perform his job. Memo Dated August 7, 2008 (attached as Ex. 46 to Defendant's Motion).

On August 8, 2008, Miller provided an additional response to Plaintiff's Request for Reasonable Accommodation, informing him that the Bureau was postponing rendering a final decision regarding his request until medical documentation regarding his request was received. Further, based upon the assessment of Dr. Anderson regarding Plaintiff's PTSD, Plaintiff was directed not to return to work until a medical release was received. Letter Dated August 8, 2008

(attached as Ex. 47 to Defendant's Motion). That same day, Cunningham provided a memo to the front lobby of FCI Williamsburg, stating that Plaintiff was not allowed access into the FCI or the FPC (Federal Prison Camp) until further notice or approval by the Warden. Memo Dated August 8, 2008 (attached as Ex. 48 to Defendant's Motion).

On August 18, 2008, Cunningham wrote a letter to Plaintiff, stating that the letter from Dr. Anderson regarding his PTSD raised concerns about whether he was capable of working in a correctional environment and directed Plaintiff to obtain additional, specific information from Dr. Anderson regarding his medical condition. Letter Dated August 18, 2008 (attached as Ex. 52 to Defendant's Motion). Dr. Anderson responded to the request by letter dated August 27, 2008. He indicated that he did not believe Plaintiff's emotional functioning precluded him from adequately performing his duties. However, he also stated that, given Plaintiff's physical condition, he believed his duties caused him undue stress and anxiety. Dr. Anderson further stated that he felt some practical accommodations would be both physically and emotionally beneficial to Plaintiff, although he did not set forth any specific accommodations. Letter Dated August 27, 2008 (attached as Ex. 53 to Defendant's Motion).[8]

Additional medical documentation was provided to the Bureau on August 29, 2008, in which a doctor with the Dorn VA Medical Center stated that Plaintiff suffered with low back pain with radiculopathy. The doctor indicated that, because of his back pain, Plaintiff had difficulty with lifting and stooping and walking for any period of time. She further indicated that his condition was compounded by his right knee pain and PTSD. Letter Dated August 29, 2008 (attached as Ex. 54

---

[8]Plaintiff testifies that the Veteran's Administration later determined that PTSD was a mis-diagnosis. Plaintiff Dep. p. 11. There is no medical evidence in the record regarding a mis-diagnosis of PTSD.

to Defendant's Motion).

On September 26, 2008, Miller provided an additional response to Plaintiff's Request for Reasonable Accommodation. Miller informed Plaintiff his request for accommodation needed to be specific in that Plaintiff he needed to indicate the position, the lowest grade he was willing to accept, and geographical location(s) he would like to work and/or to which he was willing to relocate. Lastly, Miller referred Plaintiff to a website to help locate positions he would qualify for within the Department of Justice. Letter Dated September 26, 2008 (attached as Ex. 56 to Defendant's Motion). Plaintiff indicates that he responded to the letter but did not provide the specific information requested. Plaintiff Dep. 83. He also states that the union president also wrote a letter asking that the Warden revisit the accommodation issue, but no response was ever received by Plaintiff. Plaintiff Dep. p. 83.

### E.      Plaintiff's Termination

On October 27, 2008, Miller notified Plaintiff of his proposal for Plaintiff's termination based upon Plaintiff's physical and mental inability to perform the duties of his position.[9] The letter informed Plaintiff that the Warden would make the final decision and that Plaintiff could reply to the Warden regarding the proposal within fifteen days of the proposal. Miller also notified Plaintiff that if there were any accommodations he believed would enable him to perform his duties he should communicate those to the Warden along with his reply. Later Dated October 27, 2008 (attached as

---

[9]Miller's recommendation appears to be based in part upon input from Cunningham, Langford, and Philip Bedwell, the regional human resources director. In a September 9, 2008, email from Bedwell to Cunningham and copied to Langford, Bedwell states "I think we finally have enough to send a letter to LMR [labor management relations] proposing termination for physical inability. . . . LMR will probably tell us they want some more current documentation and you will end up sending [Plaintiff] for another fitness of duty but let's try it and see, we may get lucky." Email Dated September 9, 2008 (attached as Ex. 7 to Plaintiff's Response).

Ex. 57 to Defendant's Motion).  On December 9, 2008, Plaintiff submitted a written response to his proposed termination.  In the letter, he asserts  that he requested a reasonable accommodation and the Bureau failed to engage in an interactive process with him in an effort to determine an appropriate accommodation.  He asserts that the Bureau's assumption that he cannot respond to emergencies is not supported by the limitations placed on him by his physicians.  Finally, Plaintiff asserts in the letter that, in addition to the failure to accommodate his disability, the Bureau is discriminating against him based upon his race, color, gender and age.  Memo Dated December 9, 2008 (attached as Ex. 58 to Defendant's Motion).

On March 30, 2009, Warden Owen wrote to Plaintiff responding to the concerns Plaintiff raised in his Letter of December 9, 2008, and informing Plaintiff of his decision to terminate his employment.  Warden Owen states,

> It is essential that you are completely capable of safely performing the essential functions of any position you occupy within the institution.  Your physician, Dr. John L. Eady provided documentation with permanent restrictions of no climbing, no prolonged standing/walking, no lifting/carrying greater than 40 lbs. and no kneeling, squatting or crawling because of the diagnosis of Degenerative Joint Disease of the right knee.  These restrictions prevent you from safely performing the essential functions of any position within the institution.  I have considered reassignment to other positions as well as accommodating your medical condition.  However, there are no positions within the Federal Correctional Institution where you would not present a risk to your safety or the safety of others.
>
> Based on all the available information, there is no alternative but to remove you from your positions with the Bureau of Prisons.  Your removal is in the interest of the efficiency of the service and will be effective March 30, 2009.

Letter Dated March 30, 2009 (attached as Ex. 61 to Defendant's Motion).

### F.    Purported Reasonable Accommodations

Plaintiff presents the testimony of Shoemaker and Turner, FCI employees and union

representatives, regarding possible accommodations for Plaintiff. They testify that Plaintiff could have been placed at the prison camp or the control center or could have been given an elevator key or a chair to sit in. Shoemaker Dep. pp. 42-43; Turner Dep. p. 28. Mr. Shoemaker testified that he had been given the accommodation of being exempted from having to respond to body alarms as a result of his heart condition and knee, back and ankle injuries. Shoemaker Dep. pp. 93-94.

### G.    Plaintiff's EEOC Activity

Plaintiff first contacted an EEO counselor on April 25, 2008, and he filed a Complaint of Discrimination (BOP-2008-0426) on June 10, 2008, alleging discrimination based upon disability and retaliation. Specifically, he alleged that the Bureau discriminated against him by refusing to accommodate him between March 2008 and June 10, 2008. Plaintiff Dep. pp. 36-37.[10] On July 2, 2008, the Bureau sent Plaintiff a letter acknowledging receipt of Plaintiff's Complaint of Discrimination and notifying Plaintiff that an investigation into his allegations would take place by a contract Equal Employment Opportunity Investigation firm. Letter Dated July 2, 2008 (attached as Ex. 62 to Defendant's Motion). On January 13, 2010, the Department of Justice's Complaint Adjudication Office (CAO) issued a Final Decision, in which it found no discrimination based on disability nor any retaliation. Department of Justice Final Decision p. 23 (attached as Ex. 1 to Plaintiff's Complaint).

On April 24, 2009, Plaintiff again contacted an EEO counselor, and he filed a second Complaint of Discrimination (BOP-2009-0399) on May 15, 2009, alleging discrimination based

---

[10]Neither Plaintiff nor Defendant presents the actual Complaint of Discrimination for the record.

upon race, sex, age, national origin, mental disability and retaliation. Plaintiff Dep. p. 37.[11] On June 8, 2009, the Bureau sent Plaintiff a letter acknowledging receipt of Plaintiff's Complaint of Discrimination and notifying Plaintiff that an investigation into his allegations would take place. Letter Dated June 8, 2009 (attached as Ex. 63 to Defendant's Motion). On July 10, 2009, and July 16, 2009, Plaintiff submitted letters indicating that his complaint did not include an allegation of discrimination based upon a mental disability, and so the Bureau withdraw that from its investigation. Letters Dated July 10, 16, 2009 (attached as Ex. 65 to Defendant's Motion); Email Dated August 3, 2009 (attached as Ex. 66 to Defendant's Motion). On March 24, 2010, the CAO issued a Final Decision, in which it found no discrimination based upon age, race, sex, or retaliation. Department of Justice Final Decision p. 20 (attached as Ex. 2 to Plaintiff's Complaint).

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could

_____

[11]This second Complaint of Discrimination is likewise not in the record.

-16-

reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

IV.    **DISCUSSION**

   A.    **Disability Discrimination**

Although Plaintiff alleges violations of the ADA, the United States is specifically excluded from the ADA's definition of employer, and, thus, a claim under the ADA will not stand against the United States. 42 U.S.C. §§ 12111(2), 12111(5)(B); Cassity v. Geren, 749 F.Supp.2d 380, 384 (2010). Rather, the Rehabilitation Act, 29 U.S.C. §§ 701 et. seq., provides the exclusive judicial remedy for claims based upon a federal employee's disability. Id. (citing McGuinness v. United

States Postal Serv., 744 F.2d 1318, 1322–1323 (7th Cir.1984); Boyd v. U.S. Postal Serv., 752 F.2d 410, 413–414 (9th Cir.1985)).  Nevertheless, the Rehabilitation Act and the ADA employ the same standards and purposes, and, thus, the court may rely on case law addressing claims under either statute in analyzing a case of disability discrimination.  Smaw v. Commonwealth of Va. Dept. of State Police, 862 F.Supp. 1469, 1474 (E.D.Va.1994) ("By design, the ADA standards mirror those of the Rehabilitation Act in this case.... The emergence of the ADA does not create a new avenue for claims in the area of disability discrimination; rather, the ADA incorporates the existing language and standards of the Rehabilitation Act in this area."); Hooven–Lewis v. Caldera, 249 F.3d 259 at 268 (4th Cir.2001).

The familiar proof scheme developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to claims brought under the Rehabilitation Act. See Ennis v. National Ass'n of Business & Educ. Radio, Inc., 53 F.3d 55, 57–58 (4th Cir.1995). Under this burden-shifting scheme, Plaintiff has the initial burden of establishing a prima facie case of discrimination.  Id.

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the disparate treatment.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  This is merely a burden of production, not of persuasion.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)).  In other words, the burden shifts back to Plaintiff to demonstrate by a

preponderance of the evidence that the legitimate reason produced by Defendant is not its true reasons, but was pretext for discrimination. <u>Reeves</u>, 530 U.S. at 143. Throughout the burden shifting scheme set forth in <u>McDonnell Douglas</u>, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against him.

"In a failure to accommodate case, a plaintiff establishes a <u>prima facie</u> case by showing '(1) that he was an individual who had a disability within the meaning of the statute; (2) that the[employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position ...; and (4) that the [employer] refused to make such accommodations.'" <u>Rhoads v. FDIC</u>, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (citing <u>Mitchell v. Washingtonville Cent. Sch. Dist.</u>, 190 F.3d 1, 6 (2d Cir.1999)).

To establish disparate treatment under the Rehabilitation Act, a plaintiff must first make a <u>prima facie</u> showing that he "(1) is an individual with a disability within the meaning of the [Rehabilitation Act]; (2) is otherwise qualified for the job in question; and (3) suffered an adverse employment action solely because of the disability." <u>Edmonson v. Potter</u>, 118 F. App'x 726, 728 (4th Cir. 2004) (citing <u>Halperin v. Abacus Tech. Corp.</u>, 128 F.3d 191, 197 (4th Cir. 1997)).

It is undisputed that Defendant refused to accommodate Plaintiff and that he suffered an adverse employment action solely based upon his disability when his employment was terminated. [12] Defendant argues that Plaintiff fails to establish a <u>prima facie</u> case under either theory because he

---

[12]Defendant does not specifically address whether Plaintiff is an individual with a disability under the Rehabilitation Act. For purposes of this motion, the court assumes that he is.

could not perform the essential functions of his position with or without accommodation and thus, was not otherwise qualified for the position.

An "essential function" is defined as "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Although not an exhaustive list, a job function may be viewed as essential if: (1) "the reason the position exists is to perform that function;" (2) there are a "limited number of employees available among whom the performance of that job function can be distributed;" and/or (3) "the incumbent in the position is hired for his or her expertise or ability to perform the particular [highly specialized] function." 29 C.F.R. § 1630.2(n)(2)(iiii).

According to these regulations, certain evidence may be considered in determining whether a particular function is essential:

(i) The employer's judgment as to which functions are essential;
(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3) (recognizing the list of potential evidence is illustrative rather than comprehensive).

In the letter informing Plaintiff of his termination, Warden Owen explained,

It is essential that you are completely capable of safely performing the essential functions of any position you occupy within the institution. Your physician, Dr. John L. Eady provided documentation with permanent restrictions of no climbing, no prolonged standing/walking, no lifting/carrying greater than 40 lbs. and no kneeling, squatting or crawling because of the diagnosis of Degenerative Joint Disease of the right knee. These restrictions prevent you from safely performing the essential

functions of any position within the institution.

Letter Dated March 30, 2009 (attached as Ex. 61 to Defendant's Motion). Warden Owen's conclusion that Plaintiff's restrictions prevented him from performing the essential functions of any position is supported by the Bureau's policies. The Bureau's policies require that employees in law enforcement positions must be able to perform numerous physical activities, including walking up to one hour, standing for up to one hour, ability to perform self-defense movements, running an extended distance, dragging a body an extended distance, carrying a stretcher with one other person, climbing stairs, and lifting objects weighing 25lbs. Physical Requirements for Institution Positions (attached as Ex. 68 to Defendant's Motion). The limitations placed upon Plaintiff (no climbing, no prolonged standing/walking, no lifting/carrying greater than 40 lbs; and no kneeling, squatting, crawling) specifically prevent him from performing some of these activities and implicitly prevent him from performing most others.

Additionally, the Bureau's position description for a correctional counselor, provides,

Along with all other correction institution employees, incumbent is charged with responsibility for maintaining security of the institution. The staff correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis.

Specific correctional responsibilities include custody and supervision of inmates, responding to emergencies and institution disturbances, participating in fog and escape patrols, and assuming correctional officer posts when necessary. The incumbent is required to shakedown inmates, conduct visual searches of inmate work and living areas for contraband, and is responsible for immediately responding to any institution emergencies. The incumbent must be prepared and trained to use physical control in situations where necessary, such as in fights among inmates, assaults on staff, and riots or escape attempts.

Position Description p. 3 (attached as Ex. 4 to Defendant's Motion).

Plaintiff asserts in his Response that "there are certainly physical demands associated with

performing the duties of a corrections counselor." Response p. 24. However, he argues that he has presented sufficient evidence to show that he could have performed his duties with reasonable accommodation. Plaintiff asserts that many accommodations were available, including giving Plaintiff an elevator key to avoid climbing stairs, providing him with a chair to use while processing inmates, moving him to the camp, and assigning him to the control center for body alarms.[13] While these accommodations indicate ways in which Plaintiff could have remained within the limitations placed upon him by his physician, Plaintiff fails to show how these accommodations would allow him to perform the essential functions of his position.

It is important to note that the accommodations suggested in Plaintiff's Response are different from the accommodation he specifically requested in his Request for Reasonable Accommodation form. In that form, Plaintiff requested "a work reassignment to an area and environment where the serious potential for violent act(s) and behavior against me by inmates is minimal." DOJ Form 100A (attached as Ex. 42 to Defendant's Motion). Defendant argues that this requested accommodation would eliminate another essential function of Plaintiff's

---

[13]Shoemaker testified that, as a result of some temporary health problems he was suffering, he was allowed to respond to emergencies by reporting to the control center rather than the area of the emergency. The officer normally in the control center would then respond to the emergency and Shoemaker would run the doors and assist the control center. Shoemaker Dep. pp. 93-94. Shoemaker's restrictions were temporary while Plaintiff's were permanent. While temporary assistance for a disabled employee may be a reasonable accommodation, the ADA does not require an employer to permit an additional person permanently to perform an essential function of a disabled employee's position. See EEOC v. Dollar Gen. Corp., 252 F.Supp.2d 277, 292 (M.D.N.C.2003) (citing Martinson v. Kinney Shoe Corp., 104 F.3d 683 (4th Cir.1997)). A reasonable accommodation "does not require an employer to reallocate essential job functions or assign an employee 'permanent light duty.'" Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 Fed. Appx. 314, 323 (4th Cir.2011). A reasonable accommodation further does not include a reassignment "when it would mandate that the employer bump another employee out of a particular position." E.E.O.C. v. Sara Lee Corp., 237 F.3d 349, 355 (4th Cir.2001).

position–extensive contacts with inmates. The Position Description for a Correctional Counselor indicates that "[t]he Correctional Counselor develops and implements programs within the unit to meet the individual needs of the inmates confined, to include individual as well as group counseling. . . . The Correctional Counselor plays a key role in maintaining and enhancing the security of the unit and institution by his/her extensive contacts with the inmates." Position Description (attached as Ex. 4 to Defendant's Motion) p. 1. The Position Description further provided that

> the incumbent is regularly subject to physical hazards and dangerous conditions such as assaults and hostage situations. Due to the potential for uncontrollable situations to occur in a correctional institution, the level of risk for hazardous and stressful working conditions is very high.
> The duties of this position require frequent direct contact with individuals in detention suspected or convicted of offenses against the criminal laws of the United States. Daily stress and exposure to potentially dangerous situations such a physical attack are an inherent part of this position . . . .

Position Description (attached as Ex. 4 to Defendant's Motion) p. 6. An employer is not required to change a position by eliminating the job's essential nature. Myers v. Hose, 50 F.3d 278, 282 n. 2 (4th Cir.1995) (declaring that the employer "cannot reasonably be expected to ... adjust the specifications of [the plaintiff's] particular post" to provide an accommodation under the ADA).

In addition, in response to Plaintiff's Request for Reasonable Accommodation, Miller informed Plaintiff there were no positions to which he could be reassigned where he would not present a danger to himself or others. Importantly, an individual cannot perform the essential functions of his job "if he poses a significant risk to the health or safety of others by virtue of the disability that cannot be eliminated by reasonable accommodation." Doe v. University of Maryland Medical System Corp., 50 F.3d 1261, 1265 (4th Cir.1995) (citing 29 U.S.C. § 706(8)(D); 42 U.S.C. §§ 12111(3), 12113(a)-(b)). Furthermore, an employer is not bound to "create a new position as an

accommodation to a disabled employee." Lamb v. Qualex, Inc., 33 Fed. Appx. 49, 59 (4th Cir.2002).

Plaintiff also argues that Defendant failed to engage in an interactive process to accommodate Plaintiff's disability. The applicable federal regulations provide, in part: "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). The so called "interactive process" should "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." Id. See also Haneke v. Mid–Atl. Capital Mgmt., 131 F. App'x 399, 399–400 (4th Cir.2005) ("Implicit in the fourth element [of the prima facie case] is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation"). Contrary to Plaintiff's assertions, the record reveals that Miller and Cunningham requested additional, specific information from Plaintiff, regarding the position, the lowest grade he was willing to accept, and geographical location(s) he would like to work and/or to which he was willing to relocate. Plaintiff admittedly did not provide the requested information. Thus, the undersigned finds this argument to be without merit. Nevertheless, even if the Bureau failed to fulfill its obligations to help secure a reasonable accommodation for Plaintiff, Plaintiff is not entitled to recovery "unless he can also show that a reasonable accommodation was possible and would had led to a reassignment position." Smith v. Midland Brake, Inc., a Div. of Echlin, Inc., 180 F.3d 1154, 1174 (10th Cir. 1999). As discussed above, Plaintiff has failed to make this showing.

Plaintiff has failed to present sufficient evidence to create an issue of fact as to whether he was "otherwise qualified" for the position, or whether he could perform the essential functions of his position with a reasonable accommodation. Thus, he fails to create prima facie case of a failure

to accommodate claim or a disparate treatment claim and summary judgment is appropriate.[14]

## B.  Race and Age Discrimination

Plaintiff also argues that Defendant discriminated against him based upon his race and age.

His race claim arises under Title VII and his age claim arises under the ADEA.  Title VII makes it

"an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any

individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex,

or national origin...." 42 U.S.C. § 2000e–2(a)(1).  The ADEA makes it unlawful for an employer to

fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's age. 29 U.S.C. § 623(a)(1).

The McDonnell Douglas burden-shifting framework set forth above applies to claims under

both Title VII and the ADEA[15] and the prima facie requirements are similar as well.  To establish

_____

[14]Plaintiff appears to argue that he requested and was denied accommodations prior to the determination that his limitations were permanent.  However, a temporary impairment does not qualify as a disability under the Rehabilitation Act.  See, e.g., Heiko v. Colombo Sav. Bank, 434 F.3d 249, 257 (4th Cir.2006) ("Sporadic or otherwise temporary impairments do not qualify as substantial limitations."); Garrett v. Univ. of Alabama at Birmingham Brd. of Trs., 507 F.3d 1306, 1315 (11th Cir.2007) (upholding summary judgment for defendant where "the most severe periods of limitation that [plaintiff] suffered during her cancer treatment were short-term, temporary, and contemporaneous with her treatment.").  Thus, to the extent Plaintiff complains about a failure to accommodate his limitations prior to them becoming permanent, he would not fall within the definition of disabled and would fail to meet the first prong of the prima facie case.

[15]The Supreme Court recently noted that it "has not definitively decided" whether the McDonnell Douglas framework, first developed in the context of Title VII cases, "is appropriate in the ADEA context." Gross v. FBL Financial Services, Inc., --- U.S. ----, 129 S.Ct. 2343, 2349 n.2, 174 L.Ed.2d 119 (2009). In the absence of further direction from the Supreme Court, the undersigned must follow Fourth Circuit precedent, which applies the McDonnell Douglas

a prima facie case of discrimination under either Title VII or the ADEA, a plaintiff must show (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that similarly-situated employees outside the protected class received more favorable treatment. White v. BFI Waste Services, LLC, 375 F.3d 288, 295 (4th Cir. 2004) (Title VII); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir.2004) (ADEA).

Plaintiff, as an African-American male over the age of forty, falls within the class of persons protected by Title VII and the ADEA. Further, it is undisputed that Plaintiff performed satisfactorily on his job and his employment was terminated. Defendant argues that Plaintiff fails to meet the fourth requirement for a prima facie case because he cannot show that similarly situated employees were treated differently from him.

Plaintiff presents several examples of employees he argues were similarly situated who were allowed reasonable accommodations rather than being terminated. Shoemaker, a white male, testified that he had been injured several times, and had been accommodated while employed as an electronic technician at FCI Williamsburg for injuries to his ankles, knees and back as well as complications from a heart attack. Shoemaker Dep. p. 67; Turner Dep. p. 39. Shoemaker stated that whenever he was injured he would be placed on a temporary alternate duty in which he would work from the communications room and his outside duties would be done by others. Shoemaker Dep. pp. 67-68. Mr. Shoemaker was also told not to respond to institutional emergencies. Shoemaker Dep. pp. 67-68.

Melanie Varro, another employee at FCI Williamsburg, was injured outside of work and was

---

framework to ADEA claims. See Hill, 354 F.3d at 285; see also Bodkin v. Town of Strasburg, 2010 WL 2640461 at *4-5 (4th Cir. June 29, 2010) (continuing to apply the McDonnell Douglas framework following the Gross opinion).

accommodated by the Bureau. Varro was a case manager who injured her hip and was on crutches; she was taken out of an inmate pod and placed in the administration building and then at the camp where people would transport her work to her so that she could perform her job duties. Shoemaker Dep. p. 68. Varro is a white female under the age of 40. Shoemaker Dep. p. 82. Varro worked in Unit 3 at FCI Williamsburg as well; therefore, she was under the same chain of management as Plaintiff. Miller Dep. pp. 12-14. Miller testified that he and Cunningham recommended that Varro's injuries be accommodated. Miller Dep. p. 12.

A corrections officer, Officer Jacobs, was injured and placed on a light duty assignment for over a year. Shoemaker Dep. p. 69. Officer Jacobs, a younger white male, suffered from complications due to cancer and a back injury. Plaintiff Dep. p. 49. Officer Jacobs was exempted from responding to body alarms. Plaintiff Dep. p. 49. Another employee, Juan Corzo a Unit Manager who is a Hispanic male has been permitted to work amongst the inmates while on leg braces and while using a cane for multiple months. Turner Dep. pp. 32-33. Turner and Shoemaker testified that many other employees at FCI Williamsburg have received similar accommodations to those mentioned above. Shoemaker Dep. pp. 67-71; Turner Dep. pp. 28-32.

To be similarly situated, a "plaintiff must establish that 'other employees' were similarly situated in all relevant respects; that they 'dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" See Ward v. City of North Myrtle Beach, 457 F.Supp.2d 625, 643 (D.S.C.2006). Of the employees set forth above, only Melanie Varro was under the same chain of supervision as him. Nothing in the record indicates who supervised the other employees or who made the decision to allow them an accommodation.

Shoemaker[16] testified that as a case manager Varro would have ordinarily had similar amounts of inmate contact as a corrections counselor, the position held by Plaintiff. Shoemaker Dep. p. 95. However, Varro testified to the EEO Investigator that 90% of her work was paperwork so she was able to do it from an office outside the Housing Unit, while a lot of Plaintiff's duties were "hands-on." EEO Affidavit pp. 3, 6-7 (attached as Ex. 70 to Defendant's Motion). She further testified that she was still able to perform the same job functions that she normally performed while she was in the office outside the Housing Unit. EEO Affidavit p. 5. Additionally, Varro suffered a fractured hip and was accommodated for only two months. EEO Affidavit p. 3. Defendant argues that because Varro's restrictions were only temporary, she was not similarly situated to Plaintiff since his restrictions were permanent.

Plaintiff argues that whether his restrictions are permanent is an issue of fact because only one of his medical providers indicated that his restrictions were permanent while none of his previous physicians had indicated any sort of permanency. The record reflects that various physicians had recommended light duty restrictions for Plaintiff on a continuous basis since June 27, 2007. On July 17, 2008, Plaintiff's physician indicated that the restrictions were permanent. In response to Cunningham's request for further information, the doctor indicated that Plaintiff's knee condition would get worse over time. Plaintiff fails to present sufficient evidence that any doctor provided medical documentation or opinions subsequent to the indication of permanency that would indicate otherwise. The evidence in the record, therefore, is insufficient to create an issue of fact as

---

[16]As set forth above, Shoemaker was an electrician with the Bureau, not a corrections counselor or a case worker.

to whether his restrictions were permanent.[17]  Accordingly, Plaintiff fails to show that he was similarly situated to Varro, the only employee he identified who was under the same supervision as Plaintiff.[18]  Because Plaintiff fails to present sufficient evidence of similarly situated employees who were treated differently, he fails to establish a prima facie case of race or age discrimination.[19] Therefore, summary judgment is appropriate on these claims.

Additionally, even if Plaintiff has presented a prima facie case of discrimination, summary judgment is still appropriate because Defendant has presented a legitimate, non-discriminatory reason for Plaintiff's termination, that Plaintiff was unable to perform the essential functions of his position, and Plaintiff fails to show that the reason was pretext for a discriminatory reason.

In fact, Plaintiff attempts to shift the burden to Defendant, by asserting that "the defendant

---

[17]Plaintiff also appears to argue that the permanency of his restrictions is irrelevant to his race and age discrimination claims because he requested and was denied accommodations prior to the July 17, 2008, doctor's note indicating that his limitations were permanent. Although Defendant does not specifically address the period of time prior to Plaintiff's restrictions becoming permanent, Varro is still not a similarly situated employee because her job responsibilities were different from Plaintiff's.

[18]In addition to the fact that the other employees identified by Plaintiff did not deal with the same supervisor, the evidence presented by Plaintiff indicates that the limitations placed on these employees were temporary as well.  (Shoemaker had been accommodated in the past, Shoemaker Dep. p. 67; Jacobs was placed on light duty for over a year, Shoemaker Dep. p. 69; Corzo was permitted to work among inmates while using a leg brace and cane for multiple months, Shoemaker Dep. p. 32-33).

[19]The fourth element can also be established by presenting evidence raising an inference of discrimination. See Miles v. Dell, Inc., 429 F.3d 480, 486-87 (4th Cir.2005); EEOC v. Sears Roebuck & Co., 243 F.3d 846, 851 n. 2 (4th Cir.2001) (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).  Plaintiff points to Mr. Turner's testimony, in which he states "there's a lot of people at this institution that's been injured were able to work that were mostly Caucasian males or management and they were still allowed to work." Turner Dep. p. 57.  This statement is insufficient to give rise to an inference of discrimination.  It begs the question of whether Caucasian males were "mostly" the ones getting injured.

is not entitled to Summary Judgment unless the defendant can show by irrefutable evidence that its legitimate nondiscriminatory reason for terminating, refusing to accommodate and taking other actions against [Plaintiff] is not mere pretext." Response p. 22. This argument is contrary to the well-established law that once a defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reasons, but was pretext for discrimination. Reeves, 530 U.S. at 143. Throughout the burden shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant intentionally discriminated against him.

In sum, it is Plaintiff's burden ultimately to show that illegal discrimination was the motivating factor in his termination. It is not necessary for this court to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for Defendant's decision. Hawkins v. Pepsico, 203 F.3d 274, 279 (4th Cir.2000). Furthermore, "[p]roof that the employer's proffered reasons are unpersuasive, or even obviously contrived, ... does not necessarily establish that [Plaintiff's] proffered reason is correct. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 at 146–47, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "It is not enough to disbelieve the [employer]." Love–Lane v. Martin, 355 F.3d 766, 788 (4th Cir.2004). Plaintiff must show that a reasonable jury could believe her explanation of intentional discrimination. Id. Plaintiff has failed

to meet his burden of creating a genuine dispute of material fact as to whether Defendant discriminated against him because of his disability. Therefore, summary judgment is appropriate on his discrimination claims under Title VII and the ADEA.

### C.    Retaliation

Finally, Plaintiff alleges that Defendant retaliated against him in violation of Title VII. Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) he engaged in protected activity, (2) the employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985); Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 258 (4th Cir.1998); Causey v. Balog, 162 F.3d 795, 803 (4th Cir.1998). If Plaintiff establishes a prima facie case, Defendant can rebut the presumption of retaliation by articulating a non-retaliatory reason for its actions. At that point, Plaintiff has the opportunity to prove that Defendant's legitimate, non-retaliatory reason is pretextual. See Matvia v. Bald Head Island Management, 259 F.3d 261, 271 (4th Cir.2001).

Plaintiff engaged in protected activity when he first filed a Complaint of Discrimination with the EEOC on June 10, 2008, alleging discrimination based upon his disability. Plaintiff asserts that he suffered adverse employment action when he was terminated and when Bink, a Safety Manager who was responsible for ensuring that Worker's Compensation paperwork was properly completed,

Bink Dep. p. 22, declined to file any of the forms that Plaintiff or his physicians sent to him. Plaintiff Dep. p. 74.

The Supreme Court has clarified that a different and less strenuous standard is used to define adverse employment actions in the retaliation context as opposed to other Title VII contexts: "[T]he anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington Northern & Santa Fe Rwy. v. White, 548 U.S. 53, 64, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). However, the anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Id. at 67. Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (quotation marks and citations omitted). Plaintiff's termination is clearly an adverse employment action. In addition, a reasonable employee could certainly be dissuaded from making or supporting a charge of discrimination if his employer declined to file paperwork on his behalf that was necessary for a Worker's Compensation claim. Thus, Plaintiff has presented evidence sufficient to show that he suffered adverse employment action.

However, the record is insufficient to create an issue of fact as to whether a causal connection exists between Plaintiff's protected activity and the adverse action. To meet the causal connection requirement, a plaintiff must show that the adverse action would not have occurred "but for" the protected conduct. Ross v. Communications Satellite Corp., 759 F.2d 355, 365-66 (4th Cir.1985) overruled on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). "A causal relationship [between protected activity and adverse action] requires more than simple coincidence.

Causation requires the employer's action be the consequence of the protected activities and of nothing else." Bray v. Tenax Corp., 905 F. Supp. 324, 328 (E.D.N.C. 1995). There is no evidence in the record as to when Plaintiff submitted the Worker's Compensation documentation to Bink or when Bink should have completed the paperwork but did not. Further, there is no indication in the record that Bink was aware of Plaintiff's Complaint of Discrimination. Plaintiff's evidence that a causal connection exists is limited to the testimony of Turner, who opined, "the only thing I can think is they're discriminating against [Plaintiff] for her EEO activities." Turner Dep. p. 56. The testimony is insufficient to create an issue of fact as to whether a causal connection exists between Plaintiffs EEO activities and Bink's failure to timely complete the paperwork.

Additionally, Plaintiff's termination was proposed on October 27, 2008, and became effective on March 30, 2009. In between Plaintiff's Complaint of Discrimination and his termination, his doctor placed permanent restrictions on his ability to work. Although temporal proximity alone can be sufficient to establish a causal connection, in certain circumstances, even the passage of as little as five months between filing EEOC complaint and adverse action may be enough to negate causal connection in a particular factual context. Parrott v. Cheney, 748 F.Supp. 312 (D.Md.1989), aff'd per curiam, 914 F.2d 248 (4th Cir.1990). Over four months passed between Plaintiff's EEOC Complaint and Miller's proposal that he be terminated and over nine months passed between his Complaint and his actual termination. In light of the intervening information from Plaintiff's physician that his disability had become permanent, which became the basis for Plaintiff's termination, any causal connection that could have existed based upon timing alone is negated. Plaintiff presents no other evidence of a causal connection. Therefore, he cannot establish a prima facie case of retaliation and summary judgment is appropriate. Furthermore, as discussed above,

even if Plaintiff could establish a <u>prima</u> <u>facie</u> case, summary judgment is still appropriate because Defendant has presented a legitimate, non-discriminatory reason for Plaintiff's termination, and Plaintiff fails to show that the reason was pretext for a discriminatory reason.

## V.        CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary Judgment (Document # 65) be granted and that Plaintiff's Rehabilitation Act (pleaded as ADA), Title VII, and ADEA claims be dismissed.  However, because Defendant did not move for summary judgment as to Plaintiff's breach of contract claim, the case should remaining pending.


 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

August 10, 2012
Florence, South Carolina